**Slip Op. 02-01**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

_____  **x**

ALLEGHENY LUDLUM CORP., *ET AL.*,  **:**

               Plaintiffs,  **:**      Consolidated
                                            Court No. 99-09-00566

     v.  **:**

UNITED STATES,  **:**
               Defendant

                            **:**

               and

                            **:**

USINOR, UGINE S.A., AND UGINOX SALES
CORPORATION, *ET AL.*,  **:**

             Defendant-Intervenors.  **:**
_____  **x**

[Defendant-Intervenors' motion for Judgment Upon an Agency Record granted in part and remanded.]

                                            Decided: January 4, 2002

*Collier Shannon Scott, PLLC, Paul C. Rosenthal, Kathleen W. Cannon, Lynn Duffy Maloney,(John M. Herrmann)*, for Plaintiffs.

*Robert D. McCallum*, *Jr.*, Assistant Attorney General, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Thomas B. Fatrouros)*; *Michele D. Lynch*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

*Weil, Gotshall & Manges LLP, (Stuart Rosen), Jonathan Bloom, Jennifer J. Rhodes,* for Defendant-Intervenors.

**MEMORANDUM OPINION AND ORDER**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

In this case, the court is asked, yet again, to review the subsidy calculation methodology employed by the Department of Commerce ("Commerce") during countervailing duty investigations and reviews to determine under what circumstances a privatized company is the recipient of a benefit pursuant to United States law.  This case comes before the court pursuant to Plaintiffs' and Defendant-Intervenors' USCIT R. 56.2 Motions for Judgment Upon an Agency Record.  Plaintiffs and Defendant-Intervenors challenged certain aspects of the final determination of the Department of Commerce International Trade Administration's countervailing duty investigation of stainless steel sheet and strip from France.[1]  *See Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from France*, 64 Fed. Reg. 30,774 (1999) ("*Final Determination*").  While this case was pending before the court, the Federal Circuit issued its opinion in *Delverde SrL v. United States,* 202 F.3d 1360 (Fed. Cir. 2000) *reh'g denied*, Ct. No. 99-1186 (June 20, 2000) ("*Delverde III*").  On February 29, 2000, Usinor filed, and the court granted, a motion to amend its complaint to add a claim based upon the Federal Circuit's ruling in *Delverde III*.  On July 13, 2000, the United

---

[1]  When the case was initiated, Allegheny Ludlum Corp., ("Allegheny") *et al*, the domestic producers, were the Plaintiffs, the United States (Commerce) the Defendant, and Usinor, Ugine S.A. and Uginox Sales Corp. ("Usinor"), the foreign producers, the Defendant-Intervenors.  As explained, *infra,* this case was remanded to Commerce before any decision was rendered on Allegheny's motion.  After the remand determination*,* Allegheny supported the outcome of  Commerce's redetermination and it was Usinor that objected to certain aspects of the remand results.

States requested a remand to Commerce to consider the impact of the Federal Circuit's holding in *Delverde III* to the facts of this case. The subsequent remand order instructed Commerce to "issue a determination consistent with United States law, interpreted pursuant to all relevant authority, including the decision of the Court of Appeals for the Federal Circuit in *Delverde SrL v. United States* 202 F.3d 1360 (Fed. Cir. 2000)." *Remand Order* (August 15, 2000). The court now reviews Commerce's *Final Results of Redetermination Pursuant to Court Remand: Allegheny-Ludlum Corp., et al v. United States, No. 99-09-00566* (December 20, 2000). ("*Remand Determination*").[2] The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994) which provides for judicial review of a final determination by the Department of Commerce in accordance with the provisions of 19 U.S.C. § 1516a(a)(2)(B)(i) (1994).

## II. BACKGROUND

On July 13, 1998, Commerce initiated countervailing duty investigations to determine whether manufacturers, producers or exporters of stainless steel sheet and strip from France, Italy and the Republic of Korea were receiving countervailable subsidies. *See Initiation of Countervailing Duty Investigations: Stainless Steel Sheet and Strip in Coils From France, Italy and the Republic of Korea,* 63 Fed. Reg. 37,539 (July 13, 1998). The period of investigation was calender year 1997. *Id.* Commerce issued its preliminary affirmative determination on November 17, 1998 and its final affirmative determination on June 8, 1999, finding that the total

---

[2] This case is a companion case to *GTS Industries S.A. v. United States*, 26 CIT ___ (2002). GTS Industries, formerly a subsidiary of Usinor, produced and imported products into the United States that were also subject to a countervailing duty investigation. The same privatization transaction is at issue in both cases.

estimated net countervailable subsidy ("CVD") rate was 5.38%  *ad valorem* for Usinor and all

others.  *See Preliminary Affirmative Countervailing Duty Determination and Alignment of Final*

*Countervailing Duty Determination With Final Antidumping Duty Determination:  Stainless*

*Steel Sheet and Strip in Coils from France*, 63 Fed. Reg. 63,876 (Nov. 17, 1998) ("*Preliminary*

*Determination*"); *Final Determination*, 64 Fed. Reg. 30,790.  During the investigation, the

Government of France ("France" or "French Government") identified a division of Usinor as the

sole French producer of the subject merchandise that was exported to the United States during

the period of investigation.  The French Government was the majority owner of Usinor and

Sacilor, another steel producer, until the mid-1980s.  *Final Determination*, 64 Fed. Reg. at

30,776.  After a capital restructuring in 1986, France was the sole owner of both companies.  *Id*.

In 1987, France placed Usinor and Sacilor under the ownership of a holding company, with the

holding company retaining Usinor as its name.  *Remand Determination* at 17.  In 1991, Credit

Lyonnais, a government-owned bank, purchased 20% of Usinor.  *Final Determination*, 64 Fed.

Reg. at 30,776.  Beginning in the summer of 1995 and continuing through 1996 and 1997, the

French Government privatized Usinor through a public stock offering.  *Id.*  By the end of 1997,

approximately 82% of Usinor's shares were owned by private shareholders, with the remaining

shares owned by employees and  "stable shareholders."[3]  *Remand Determination* at *17.*

Despite the public stock offering that privatized Usinor, Commerce concluded in the

*Remand Determination* that Usinor was the "same person" after the privatization and, since it

---

[3] Article 4 of the French privatization law establishes procedures for designating "Stable Shareholders" under guidance from the Privatization Commission.  *Usinor Verification Report* at 7,  Feb. 19, 1999. The purpose seems to be to provide a core group of investors who are restricted from selling during the privatization process, in order to promote stability and project confidence in the sale.

had already determined that Usinor had previously received subsidies, it did not have to analyze

whether the past subsidies were extinguished by the change in ownership transaction.  In making

its "same person" finding Commerce used principles of United States law "in the general

corporate context."  *Remand Determination* at 10.  Additionally, Commerce used a 14-year

average useful life (AUL) to allocate the benefits bestowed by nonrecurring subsidies.[4]  Based

upon its findings, Commerce recalculated Usinor's CVD rate to be 7.72% *ad valorem*.

### III. STANDARD OF REVIEW

The court must evaluate whether the remand findings are supported by substantial

evidence on the record or otherwise in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B).

"Substantial evidence is more than a mere scintilla;" it is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Consolidated Edison Co. of New York*

*v. NLRB*, 305 U.S. 197*,* 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States,* 750 F.2d

927, 933 (Fed. Cir. 1984).  To determine if the agency's interpretation of the statute is in

accordance with law "we must first carefully investigate the matter to determine whether

Congress's purpose and intent on the question at issue is judicially ascertainable."  *Timex V.I. v.*

*United States*, 157 F.3d 879, 881 (Fed. Cir. 1998).  The expressed will or intent of Congress on a

---

[4]  "Commerce assumes that when a company sells 'productive assets' during 'the average useful life,' a pro rata portion of that subsidy 'passes through' to the purchaser at the time of sale. Commerce then quantifies the assumed 'pass through' amount, makes adjustments based on the purchase price, allocates an amount to the year of investigation, and calculates the *ad valorem* subsidy rate."  *Delverde III,* 202 F.3d at 1363 (citing *Affirmative Countervailing Duty Determination: Certain Steel From Prod. From Aus.*, 58 Fed. Reg. 37,217, 37,268-69 (1993)) (citation omitted).  The court reaches a decision in this case solely on the issue of the effect of privatization, and, therefore, will not discuss which AUL is correct.

specific issue is dispositive. *See Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 233-237 (1986). If the court determines that the statute is silent or ambiguous, the question to be asked is whether the agency's construction of the statute is permissible. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984). This deference is due when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. *United States v. Mead Corp.* 121 S.Ct. 2164, 1271 (2001). This is not limited to notice and comment rulemaking but is given to those "statutory determinations that are articulated in any 'relatively formal administrative procedure.'" *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1380 (Fed. Cir. 2001). Therefore, statutory interpretations articulated by Commerce during antidumping proceedings are entitled to judicial deference under *Chevron*. *Id.* at 1382. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

## IV. DISCUSSION

A.      *History of the Issue*

A brief history of the privatization subsidy issue is appropriate. The applicable law attempts to level the playing field by imposing a countervailing duty on subsidized imported goods sold in the United States which materially injure a domestic industry. A subsidy is a financial benefit conferred on a natural or legal person (usually the producing company) by a government entity or agent. *See* 19 U.S.C. § 1677(B)

In the past twenty years many countries have moved to privatize state-owned enterprises and thereby shift major manufacturing activity from public to private entities. Thus many plants formerly run entirely or mostly under government finance and control are now under the control of private shareholders. The question then becomes: if the plant received non-recurring financial benefits when it was government owned and operated, do those benefits survive the privatization and are the new owners, therefore, subject to countervailing duties on products they export to the United States?

Commerce first confronted this issue in 1989 when it decided that no benefits had passed to the recently privatized firm under review because the sale was for full market value and at arm's length. *See Lime from Mexico; Preliminary Results of Changed Circumstances Countervailing Duty Administrative Review,* 54 Fed. Reg. 1,753, 1,754-55 (Jan. 17, 1989). By 1993, however, Commerce had changed its views in the context of steel countervailing duty investigations. Commerce ignored the change of ownership at fair market value, which it had found significant in *Lime from Mexico*, and held that the previously bestowed subsidies survived such a sale and thus it assumed a continuing benefit to the new owners. *See Certain Hot Rolled Lead and Bismuth Carbon Steel Products from the U.K.*, 58 Fed. Reg. 6,237 (Jan. 27, 1993). [5] Commerce then issued a fuller explanation of its position on subsidies in the privatization context when it published the General Issue Appendix covering several different CVD investigations. *See Final Affirmative Countervailing Duty Determination: Certain Steel*

---

[5] The historical and political context of this decision is discussed in Julie Dunne, Note, Delverde *and the WTO's* British Steel Decision *Foreshadow More Conflict Where the WTO Subsidies Agreement, Privatization and the United States Countervailing Duty Law Intersect,* 17 Am. U. Int'l. L. Rev. 79, 89  n.38 (2001).

*Products from Austria, General Issues Appendix,* 58 Fed. Reg. 37,217, 37,225 (July 9, 1993). In this new privatization methodology Commerce essentially assumed that a portion of the previously bestowed subsidy passed through to the new owners from the state owned entity depending on when it had been initially granted. In this methodology the life of the subsidy in years (calculated by a formula based on amortization of assets) was the critical component and whether the sale was for full market value had no significance.

Commerce's methodology of ignoring a sale at full market value was rejected by this court but reinstated by the Court of Appeals for the Federal Circuit. In *Saarstahl, AG v. United States*, 18 CIT 525, 858 F.Supp. 187 (CIT 1994) this court applied pre-URAA law[6] and held that

---

[6] In 19 U.S.C. § 1677(5)(A)(ii) (1988) a subsidy was defined as "provided or required by government action to a specific enterprise or industry. . . whether paid or bestowed directly or indirectly on the manufacture, production or export of any class or kind of merchandise." This provision was amended in 1994 as part of the Uruguay Round Agreement Act to read as follows:

(B)  Subsidy described

A subsidy is described in this paragraph in the case in which an authority --

(i) provides a financial contribution,

\* \* \* \*

to a person and *a benefit is thereby conferred*.

(Emphasis added).

The URAA also included 19 U.S.C. §1677(5)(F) which stated:

A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

subsidies are extinguished in a true arms-length sale for full market value because the value of

the company includes the benefit of any previous subsidies which the buyer pays for at time of

purchase, leaving no remaining competitive advantage.

The Federal Circuit disagreed, holding that Commerce's decision to countervail

previously bestowed subsidies was reasonable absent an explicit mandate from Congress to the

contrary and that the CIT should have deferred to Commerce's interpretation. *See Saarstahl AG*

*v. United States*, 78 F.3d 1539, 1544 (Fed. Cir. 1996). The appeals court reasoned that the statute

at issue did not require countervailable subsidies to confer a benefit and that once Commerce

finds a governmental subsidy it can assess countervailing duties on the new entity if the private

purchaser repaid none or only some of the subsidy received prior to privatization.

In December 1999, the World Trade Organization first addressed the issue in a case also

originating in the steel industry. *See WTO Dispute Panel Report on United States - Imposition of*

*Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products*

*Originating in the United Kingdom*, No. WT/DS138/R (Dec. 23, 1999). The Panel examined

Commerce's assessment of countervailing duties on steel after a complaint by the European

Communities. Commerce had specifically determined that the privatization at issue was at

arm's-length for fair market value and consistent with commercial considerations. *Panel Report,*

¶ 6.23. The Panel held that Commerce's decision to countervail was contrary to the definition of

a subsidy contained in the *Agreement on Subsidies and Countervailing Measures*, Pt. I, Art. 1

(1994). Specifically the Panel stated, *inter alia*, that the existence of a benefit could only be

---

This provision was widely thought to have been added in reaction to this court's opinion
in *Saarstahl* which at the time of URAA enactment had not been reversed by the Federal Circuit.
*See Delverde III,* 202 F.3d at 1367 n.3.

found by comparing whether the recipient was better off than it would be without the contribution and that "the marketplace provides an appropriate basis for comparison . . . whether the recipient has received a 'financial contribution' on terms more favorable than those available to the recipient in the market." *Panel Report*, ¶ 6.65. The Panel found that the privatization of a government owned company in an arm's length, fair market value transaction eliminates any benefit from prior subsidization. The United States appealed to the WTO's Appellate Body which upheld the Panel's Report and recommended " the United States [to] bring its measures found in the Panel Report, as upheld by this Report, to be inconsistent with its obligations under the SCM agreement into conformity with its obligations under that agreement." *WTO Dispute Appellate Body Report on United States - Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom*, No. WT/DS138/R at ¶ 76 (May 10, 2000).

The Federal Circuit noted the Panel decision in *Delverde III* when it reviewed a decision by this court in a CVD case involving pasta from Italy.[7] *See Delverde SrL v. United States*, 22 CIT 947, 24 F. Supp. 2d 314 (1998) ("*Delverde II*"). Delverde, the foreign producer, had asked this court to review the imposition of CVD by Commerce when the department, using its General Issues Appendix methodology, held Delverde responsible for a pro-rata portion of nonrecurring subsidies that had been granted to the former owner. Initially, this court had agreed with Delverde's argument that Commerce could not assume the pro-rata portion survived the sale and remanded to Commerce to examine the sale itself to determine whether Delverde received a subsidy through its purchase of plant assets from an owner that had previously received

---

[7] The *Delverde* case will be discussed at length *infra* in this opinion.

subsidies.  *Delverde Sr.L v. United States*, 21 CIT 1294, 989 F. Supp. 218 (1997)[8] ("*Delverde I*").

On remand, however, after Commerce had further explained its position, the result was different.  This court found permissible Commerce's presumption of pass through of subsidies when it assessed benefit only at the time the subsidization occurred.  *Delverde II,* 24 F. Supp. 2d at 317.   The Federal Circuit disagreed, holding that the statutory language required Commerce to determine whether the purchaser received both a financial contribution and a benefit from a government before concluding that the purchaser was subsidized.  *See Delverde III*, 202 F.3d at 1367.  The court went on to instruct that Commerce examine the issue "based on the facts and circumstances, including the terms of the transaction. . . ."  *Id*. at 1369-70.  It specifically stated that its decision was not inconsistent with that of the WTO Dispute Panel.  *Id*. at 1369.

B.       *What does Delverde require?*

The court views the *Delverde* decision as central to the resolution of this case.  The parties have sharply divergent views on the meaning of that decision and its application to the administrative action now before the court.  Commerce asserts that, in accordance with the Federal Circuit's holding in *Delverde III,* it formulated a new two-step inquiry to determine if prior subsidies passed through to the new privatized entity.

> Consistent with the Federal Circuit's analysis in *Delverde III*, Commerce announced a *two-step* inquiry.  As the *Remand Determination* shows, Commerce first analyzes whether the pre-sale and post-sale entities are for all intents and purposes the same person.  If they are, Commerce's analysis stops, as all of the elements of a subsidy will have been established with regard to the producer under investigation, *i.e.*, the post-sale entity.  If, however,  the two entities are not the

---

[8] Both this court and the Federal Circuit assumed the sale in *Delverde* was between private entities.  *Delverde III*, at 202 F.3d 1362.

same person, Commerce will proceed to the second step in its inquiry and will examine whether a subsidy has been provided to the post-sale entity through the change-in-ownership transaction itself.

*Defendant's Mem. in Opp'n to Pls.' and Def.-Intervenors' Mot. for J. upon the Agency R.* at 16-17 (*"Def.'s Br."*). After applying the two-step analysis to Usinor, Commerce concluded it did not have a duty to analyze whether the subsidies passed to Usinor because Usinor was the same "person" before and after the privatization. *Id.* at 18.

> After a lengthy review and analysis of the remand record, Commerce determined that government-owned Usinor and privatized Usinor were for all intents and purposes the same person. As a result, the prior subsidies remained attributable to privatized Usinor, as all of the elements of a subsidy were established with regard to privatized Usinor.
> With this outcome it became unnecessary for Commerce to proceed to the second step in its privatization analysis, which would have involved an inquiry into whether a subsidy had nevertheless been provided to the privatized entity through the privatization transaction itself. *Commerce, therefore, did not address the issue whether the transaction's purchase price had been fair market value.*

*Id.* at 18 (emphasis added). Therefore, since Commerce had previously determined that Usinor was the recipient of subsidies, it imputed the subsidies to Usinor after the privatization.

Usinor asserts the *Remand Determination* is contrary to *Delverde III* because Commerce "deems wholly irrelevant" the fact that Usinor was privatized through an arm's-length global public stock offering and failed to analyze the terms of the change in ownership transaction to determine if the subsidies passed through to the privatized entity . *Def.-Intervenors' Supplemental Mem. In Supp. of Mot. for J. Upon the Agency Record* at 3-4 (*"Def.-Intervenors' Supp. Mem."*). Usinor claims "Commerce's 'same person approach'. . . ignores the terms of the transaction and instead focuses exclusively on whether the newly-purchased entity is 'substantially the same business' as the company that received the subsidies. *Id.* at 3. Additionally, Usinor claims that the *Remand Determination* is contrary to Agreement on

Subsidies and Countervailing Measures and inconsistent with the WTO decision in *Appellate Body Report on United States - Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom*, No. WT/DS138/R at ¶ 76 (May 10, 2000).  In the alternative, Usinor argues that "even if some type of 'same person' analysis were appropriate, the record facts relating to [Usinor 's] privatization show that it was not the 'same person' following the privatization and thus should not be saddled with prior subsidies" *Def.-Intervenors' Supp. Mem.* at 4.

The central question is whether Commerce's application of its method complies with congressional intent embodied in the statutory language of 19 U.S.C. § 1677(5)(F), as interpreted by the Federal Circuit in *Delverde*.  Consistent with the court of appeals' decision in *Delverde*, this court finds the statute's meaning to be clear, and, therefore, does not reach the issue of deference to Commerce's interpretation under the *Chevron* doctrine. *See Delverde III*, 202 F.3d at 1367.  "[W]e need only determine whether Commerce's methodology is in accordance with the statute." *Id.*  As noted above, the *Delverde* decision assumed the sale of assets from one private company to another.  The question directly before the court was whether Commerce's methodology for determining a subsidy was permitted under the new statutory direction by Congress.  Commerce assumed that when a company sells "productive assets" previously subsidized during their "average usual life" a pro rata portion of the subsidy "passes through." *Id.* at 1363.

The Federal Circuit struck down this methodology as not in accordance with 19 U.S.C. § 1677(5).  The court characterized the method used in *Delverde* as a *per se* rule which avoided looking at the "facts and circumstances of the sale." *Delverde III*, 202 F.3d at 1364.  The Federal

Circuit stated:

> [W]e have come to the conclusion that the Tariff Act as amended does not allow
> Commerce to presume conclusively that the subsidies granted to the former owner
> of Delverde's corporate assets automatically "passed through"to Delverde
> following the sale. Rather, the Tariff Act requires that Commerce make such a
> determination by examining the particular facts and circumstances of the sale and
> determining whether Delverde directly or indirectly received both a financial
> contribution and benefit from a government.

*Id.* at 1364. The court of appeals, therefore, interpreted section 1677(5) to prohibit Commerce

from adopted any *per se* rule that a subsidy passes through, or is eliminated, with a change of

ownership. *Id.* at 1366.

Commerce, the court granted, did have some flexibility to establish a methodology for

calculating the financial contribution and benefit conferred on a person. *Id.* However, contrary to

Commerce's assertion in the case now before the court, the *Delverde* court expressed no doubt

that the new statute required two actions from Commerce: one, that the terms of the sale must be

examined, and must include analysis of the entire transaction to determine if the subsidy (not the

corporate identity) passed through to a person now under investigation. *Id.* at 1365-66. In

addition, such examination must focus on the new owner. According to the *Delverde* decision,

the term "person" is not open to interpretation. The court said that "person" means the purchaser

of the asset.

> [W]e conclude that the statute does not contemplate any exception to the
> requirement that Commerce determine that a government provided both a financial
> contribution and benefit to a person, either directly or indirectly, by one of the acts
> enumerated, before charging it with receipt of a subsidy, *even when that person*
> *bought corporate assets from another person* who was previously subsidized.

*Id.* at 1366 (emphasis added). In *Delverde* the purchaser was a private company, buying some

portion of a subsidized company's assets. In the instant case, the purchasers are the shareholders

of the newly privatized company buying all the assets of the company in an initial public offering

from the Government of France. In either case, the Federal Circuit's teachings are clear that in

order to countervail the imported product, "Commerce must find that the purchaser *indirectly*

received subsidies from a government." *Id.* at 1367 (emphasis in original).

The Federal Circuit emphasizes that the legislative history supports a reading of the

statute, "as plainly requiring Commerce to make a determination that a purchaser of corporate

assets received both a financial contribution and a benefit from a government. . . ." *Id.* The court

was even more specific and found the methodology contrary to law because,

> [i]t did not consider *any* of the facts or circumstances of the sale relevant.
> Commerce produced no evidence that Delverde received goods for less than
> "adequate remuneration."

*Id.* (emphasis in original).

The court in *Delverde* did not have Commerce's novel "personhood" methodology before

it, but was explicit enough in its description of when a rule can be considered *per se* that the

decision provides clear guidance. A methodology is *per se,* and therefore contrary to the statute,

when it determines that a subsidy continues to be countervailable to a new owner following a

change in ownership without looking at the transaction itself. *Id.* The Federal Circuit directed

that any methodology must examine the facts of the sale to determine if the new owner, "paid full

value for the asset and thus received no benefit from the prior owner's subsidies. . . ." *Id.* at 1368.

Such an analysis must focus on the new owner, since that entity is the producer of the goods at

issue during the period of investigation under review.

The *Delverde III* court did note that there are differences between the sale of a single asset

and a wholesale privatization. A private seller will presumably always seek the highest price for

its assets, while a government may have other goals. *Id.* at 1369. Similarly, there are differences between the elements of the transaction which must be evaluated when the sale is of a single asset or is a privatization of an entire company through the sale of stock. These differences, however, do not alter the statutory requirements for determining if a financial contribution and benefit was conferred on the new owner. Variations in the structure of a transaction and the motives of the parties involved do not relieve Commerce of its responsibility to look at the facts and circumstances of the sale to determine if the new owner received directly or indirectly a subsidy for which it did not pay "adequate remuneration." *Id.* at 1368.

Finally, the Federal Circuit, to re-enforce its underlying reasoning and amplify the analysis required of Commerce, referred to the WTO decision in *British Steel*. There, as noted above, when looking at the facts of government privatization of a steel company, where the terms were at arms-length and for fair market value, the WTO determined no subsidy passed through to the new owners. The Federal Circuit emphasized that its reasoning in *Delverde* is not inconsistent with the WTO's reasoning in *British Steel*. *Id.* at 1369. The court reads this portion of the *Delverde* opinion to mean that any methodology adopted Commerce must recognize the possibility that a subsidy can be extinguished by a privatization, even the privatization of an entire company, if a thorough analysis of the transaction supports that conclusion.

The Federal Circuit in *Delverde* laid out certain criteria that at a minimum any new methodology must include. First, Commerce cannot rely on any *per se* rule. Second, it must look at the facts and circumstances of the TRANSACTION, to determine if the PURCHASER, received a subsidy, directly or indirectly, for which it did not PAY ADEQUATE COMPENSATION. In this instance, Commerce avoids examining the terms of the sale by

arguing that under the four-part test it developed, if the pre- and post-corporation is the same

person, it is not required to determine if the subsidy it found to exist pre-privatization continues

post-privatization. This argument contravenes the Federal Circuit's holding in *Delverde III*.

From *Delverde III*, it is evident that the court interpreted section 1677(5)(F) as *requiring*

Commerce to determine if the subsidy continued to benefit the post-privatized corporation. In

this instance, Commerce has developed a methodology that circumvents its statutorily mandated

duty to determine if a benefit was conferred on the privatized corporation. To determine if Usinor

was the same "person" Commerce used a four-factor test based on general corporate law

principles.

> [W]here appropriate and applicable we would analyze such factors as (1) continuity of general business operations, including whether the successor holds itself out as the continuation of the previous enterprise, as may be indicated, for example, by the use of the same name, (2) continuity of production, (3) continuity of assets and liabilities, and (4) retention of personnel. . . . [T]he Department will generally consider the post-sale entity to be the same person as the pre-sale entity if, based on the totality of the factors considered, we determine that the entity sold in the change-in-ownership transaction can be considered a continuous business entity because it operated in substantially the same manner before and after the change in ownership.

*Remand Determination* at 14-15.[9] Commerce has erroneously read *Delverde III* as leaving the

analysis of the privatization transaction to its discretion. It is clear the method used to analyze the

---

[9] Commerce does not cite to any precedents or other supporting sources for using this test, other than a Corporation Practice Guide and to say it is "how this type of issue has been handled under U[nited] S[tates] law in the general corporate context." *Remand Determination* at 10. It appears to be similar to one used by courts to determine if successor corporations are still liable to third parties, who are not parties to the merger, for the actions of the original corporation. *See e.g. Fehr Bros., Inc. v. Scheinman*, 121 A.D.2d 13, 17, 509 N.Y.S.2d 304, 307 (N.Y. App. Div. 1986). The court is not persuaded that this test applies here. In this case there is no reason for Commerce to default to a corporate law analysis because the facts of the sale will disclose whether the new owners compensated the government for previous subsidies.

privatization transaction is left to the discretion of Commerce. *See Delverde III* 202 F.3d at 1367, *citing* H.R. Rep. No. 103-826(I), at 110 (1994). However, Commerce is *required* to examine the transaction to determine if a financial contribution and benefit "passed through" to the privatized corporation. *See* 19 U.S.C. § 1677(5)(B).

Although Commerce's "person" analysis is not an explicit *per se* rule, it still fails to meet the requirements of the statute because it concludes that a purchaser received a subsidy without making "specific findings of financial contribution and benefit. . . that are required by §§ 1677(5)(D) and (E)." *Delverde III*, 202 F.3d at 1367. An initial public offering of a formerly government controlled corporation will often involve the same entity pre- and post-sale using Commerce's criteria. Indeed, in nearly every circumstance that a state-run enterprise is privatized as a whole entity, Commerce would be able to find that the same "person" exists. Commerce's use of a methodology that eliminated the need to determine if the subsidies passed through to the privatized entity in this situation was specifically rejected by the Federal Circuit in *Delverde III*.

> Commerce's methodology conclusively presumed that Delverde received a subsidy from the Italian government– *i.e.*, a financial contribution and a benefit, simply because it bought assets from another person who earlier received subsidies. Commerce deemed the fact that Delverde bought the assets, as agreed to by both parties, at fair market value to be *irrelevant* to the determination whether it received a subsidy. It did not consider *any* of the facts and circumstances of the sale relevant. Commerce produced no evidence that Delverde received goods at less than "adequate remuneration."

*Id.* (citations omitted). As the holding in *Delverde III* mandates, the change in ownership triggers Commerce's duty under 19 U.S.C. § 1677(5)(D) and (E) to determine if privatized Usinor received a financial contribution and benefit from the French Government. Therefore, the court finds that Commerce's failure to analyze the privatization transaction to determine if Usinor received a subsidy after it was privatized is contrary to *Delverde III* and the statutory intent of

section 1677(5)(F).

The court recognizes that the Usinor privatization is a complex transaction. This, however, only heightens the need for in-depth and focused analysis. A short review of the privatization reveals several facts ignored by Commerce in its *Remand Determination*, which may prove significant to the required inquiry. In 1995 the French Government moved to privatize Usinor. *Final Determination*, 64 Fed. Reg. at 30,776. France publically announced the decision to privatize on May 31, 1995. An invitation to bid on shares published in the Official Gazette in June 1, 1995. *Usinor Verification Report* at 7 (Feb. 19, 1999). The price of those shares was determined by the French Privatization Commission, based on a valuation report by outside financial banking firms, Paribas and SBC Warburg. *Id.* at 8.

The Privatization Commission is an independent body. Members serve five year terms and cannot be removed other than in extreme circumstances. *Government of France Verification Report* at 2 (Feb. 21, 1999). Generally, the Commission, relying on the analysis of the outside banks, sets a market value to price the stock for a privatization. In this case Usinor's value was compared to other steel companies in Europe. *Usinor Verification Report* at 7. The Commission will allow a privatization to go forward only if the stock can be sold above the minimum price set by the Commission. So, in theory, no company will be sold at less than fair market value under the French law. *Government of France Verification Report* at 3.

The privatization of the controlling interest here involved two public offerings. 64 Fed. Reg. 30,776. The French public offering was set at FF 86 per share. The international public offering was set at FF 89. *Usinor Verification Report at 7.* In addition an employee offering was done with the price ranging from FF 68.8 to FF 86, and a sale of certain stock at FF 90.78, was

placed with so-called "Stable Shareholders." *Id.* At the end of 1995, the French Government

retained a 9.8% interest in Usinor. *Mem. in Supp. of Mot. for J. on the Agency Record*, June 16,

2000, at 6. ("*Def.-Intervenors' Initial Br."*) International or French public investors held 82% of

the stock. *Def.'s Br. at 5.* The remaining stock was held by stable shareholders and employees of

Usinor. 64 Fed. Reg. 30,776.

In 1997, France distributed most of its remaining stock, so that it held less than 1%. *Def.-*

*Intervenors' Initial Br.* at 6. The Government of France turned over this stock, without

compensation, to stable shareholders and employees who held their initial purchase of stock for a

required time. 64 Fed. Reg. 30,776. By 1998 the government had completely divested itself of

Usinor. *Id.* Even this cursory examination of the record raises several questions. Some facts

point to the probability that the stock offering represented a true arms-length transaction for fair

market value, which may include "adequate remuneration" to the government by the new owners

for any previous subsidies bestowed. Other facts point to possible mechanisms, such as the use of

"stable shareholders," that could provide a vehicle for subsidy pass-through. On remand it is

imperative, and required by 19 U.S.C. § 1677(5), as interpreted by the court in *Delverde III*, that

Commerce examine the details of the transaction to determine if goods imported by Usinor during

the POI of 1997 were subsidized.

## V. CONCLUSION

For the foregoing reasons, the court holds that the Department's *Final Results of Redetermination Pursuant to Court Remand: Allegheny-Ludlum Corp., et al v. United States, No. 99-09-00566* (December 20, 2000) is not in accordance with law and therefore will be remanded to the agency for review and action consistent with this opinion.

SO ORDERED.

Dated: _____                   _____
     New York, NY                                   Judith M. Barzilay
                                          Judge