**Slip Op. 02-115**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

| | x | |
|---|---|---|
| GTS INDUSTRIES S.A., | : | |
| Plaintiff, | : | Consolidated Court No. 00-03-00118 |
| v. | : | |
| UNITED STATES, | : | |
| Defendant, | | |
| | : | |
| and | | |
| | : | |
| U.S. STEEL GROUP, A UNIT OF USX CORPORATION, *ET AL.*, | : | |
| Defendant-Intervenors. | : | |
| | x | |

[Department of Commerce's Redetermination Pursuant to Remand Sustained]

Decided: September 24, 2002

*deKieffer & Horgan, (Donald E. deKieffer, J Kevin Horgan, Marc E. Montalbine),* for Plaintiff.

*Robert D. McCallum, Jr.,* Assistant Attorney General, United States Department of Justice; *David M. Cohen*, Director, *(Lucius B. Lau)*, Assistant Director, Commercial Litigation Branch, Civil Division United States Department of Justice, *(David D'Allessandris)*; *David W. Richardson,* Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

*Dewey Ballantine LLP, (John A. Ragosta, John R. Magnus), Hui Yu*, for Defendant-Intervenors.

**MEMORANDUM AND ORDER**

**BARZILAY, JUDGE:**

**I. INTRODUCTION**

This opinion constitutes the latest writing in a continuing effort of this court to clarify the statutory and case law concerning when non-recurring subsidies can continue to be countervailable after a formerly subsidized business entity is privatized. The court now reviews the Department of Commerce's ("Commerce" or "Department") *Results of Redetermination Pursuant to Court Remand, GTS Industries S.A. v. United States*, Court No. 00-03-00118 (CIT Jan. 4, 2002) (June 3, 2002) ("*Remand Determination II*"). This case originated pursuant to Plaintiff's and Defendant-Intervenors' USCIT R. 56.2 Motions for Judgment Upon an Agency Record. Defendant-Intervenors challenged certain aspects of the final determination of the Department of Commerce International Trade Administration's countervailing duty investigation of carbon-quality steel plate from France. *See Final Affirmative Countervailing Duty Determination: Certain Cut-to-length Carbon-Quality Steel Plate from France*, 64 Fed. Reg. 73,277 (Dec 29, 1999) ("*Final Determination*"). While Commerce's *Final Determination* was pending before the court, the Federal Circuit issued its opinion in *Delverde SrL v. United States,* 202 F.3d 1360 (Fed. Cir. 2000), *reh'g denied,* Court No. 99-1186 (June 20, 2000) ("*Delverde III*"). *Delverde III* required Commerce to examine the facts and circumstances of the privatization transaction itself to determine whether previously bestowed subsidies "passed through" to the new owners.

On July 31, 2000, Defendant United States, requested a remand to Commerce to consider the impact of the Federal Circuit's holding in *Delverde III* to the facts of this case. The

subsequent remand order instructed Commerce "(1) to determine the applicability, if any, of the decision by the Court of Appeals for the Federal Circuit in *Delverde SrL v. United States* 202 F.3d 1360 (Fed. Cir. 2000) *reh'g denied*  (June 20, 2000) to this proceeding, and (2) embark upon further fact finding if appropriate . . . ."  *Remand Order* (August 9, 2000).  The court reviewed Commerce's *Final Results of Redetermination Pursuant to Court Remand in GTS Industries S.A. v. United States,* Court No. 00-03-00118 (December 22, 2000) ("*Remand Determination I*") in *GTS Industries S.A. v. United States,* 26 CIT ___, 182 F. Supp. 2d 1369 (2002) ("*GTS I*").[1]  The court found that Commerce had developed a methodology that circumvents its statutorily mandated duty, under 19 U.S.C. § 1677(5)(F), to determine if a benefit was conferred on the privatized corporation.  Therefore, the court remanded the case to Commerce and ordered that Commerce look at the facts and circumstances of the transaction as *Delverde III* required to determine if the purchaser received a subsidy, directly or indirectly, for which it did not pay adequate compensation.  *See GTS I*, 182 F. Supp. 2d at 1378.  The court now reviews Commerce's actions taken pursuant to its instructions.  The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994), which provides for judicial review of a final determination by the Department of Commerce in accordance with the provisions of 19 U.S.C. § 1516a(a)(2)(B)(I) (1994).

## II. BACKGROUND

Familiarity with the facts presented in *GTS I* is presumed; however, a brief summary of

---

[1]  This case is a companion case to *Allegheny Ludlum Corp., et al., v. United States*, 26 CIT __ ,182 F. Supp 2d. 1357 (2002).  *Allegheny* involved imports from GTS' parent company Usinor and the same privatization transaction is at issue.

the facts is necessary to delineate the pending issues in Commerce's *Remand Determination II.*

On March 16, 1999, Commerce sought to investigate whether subsidies were given by the French

Government to certain elements of the French steel industry. *See Initiation of Countervailing*

*Duty Investigations: Certain Cut-to-Length Carbon-Quality Steel Plate From France, Indonesia,*

*Italy, and the Republic of Korea*, 64 Fed. Reg. 12,996 (March 16, 1999). The period of

investigation was calender year 1998. In its final affirmative determination, Commerce

determined that GTS' total estimated CVD rate was 6.86%. *Final Determination,* 64 Fed. Reg.

at 73,298. Beginning in the summer of 1995 and continuing through 1996 and 1997, the French

Government privatized Usinor through a public stock offering. *See Final Affirmative*

*Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from France*, 64

Fed. Reg. 30,774, 30,776 (1999). By the end of 1997, the vast majority of Usinor's shares were

owned by private shareholders, with the remaining shares owned by employees and "stable

shareholders."[2] *Id.* Prior to 1992, Usinor owned approximately 90% of GTS. *Final*

*Determination,* 64 Fed. Reg. at 73,278. From 1992 to1995, Usinor reduced its holding in GTS.

*Id.* Through two separate transactions, one occurring in 1992 and the other in 1996, Usinor

transferred a majority of interest in GTS to AG der Dillinger Huttenwerks ("Dillinger"). *Id.*

However, Usinor retained a 48.75% interest in the holding company Dillinger which in turn

owned 99% of GTS. *Id.* Despite the public stock offering that privatized Usinor, Commerce

concluded in *Remand Determination I* that Usinor was the "same person" and thus, the

---

[2] The French privatization law establishes procedures for designating "Stable Shareholders." *GTS Questionnaire Response* at 15 (Sept. 19, 2000). The purpose seems to be to provide a core group of investors who are restricted from selling during the privatization process, in order to promote stability and project confidence in the sale.

previously determined subsidies automatically passed through after privatization.  *Remand*

*Determination I* at 14.[3]

In its original determination, Commerce formulated a new two-step inquiry to determine

if prior subsidies passed through to the new privatized entity.

> Consistent with the Federal Circuit's analysis in *Delverde III*, Commerce
> announced a two-step inquiry.  Commerce first analyzes whether the pre-sale and
> post-sale entities are for all intents and purposes the same person.  If they are,
> Commerce's analysis stops, as all of the elements of a subsidy will have been
> established with regard to the producer under investigation, *i.e.*, the post-sale
> entity.  However, if the two entities are not the same person, Commerce will
> proceed to the second step in its inquiry and will examine whether a subsidy has
> been provided to the post-sale entity through the change-in-ownership transaction
> itself.

*GTS I,* 182 F. Supp. 2d at 1375 (quoting *Def.'s Mem. In Opp'n to Pl.'s and Def.-Intervenors'*

*Mot. for J. Upon Agency R.* ("*Def.'s Br.*") at 15).  After applying the two-step analysis to Usinor,

Commerce concluded it did not have a duty to analyze whether the subsidies passed to Usinor

because Usinor was the "same person" before and after the privatization.  *Id*. at 1375-76 (citing

*Def.'s Br.* at 16).

_____

[3]  To determine if Usinor was the same "person" Commerce used a four-factor test based
on general corporate law principles.

> [W]here appropriate and applicable, we would analyze such factors as (1)
> continuity of general business operations, including whether the successor holds
> itself out as the continuation of the previous enterprise, as may be indicated, for
> example, by the use of the same name, (2) continuity of production, (3) continuity
> of assets and liabilities, and (4) retention of personnel. . . . [T]he Department will
> generally consider the post-sale entity to be the same person as the pre-sale entity
> if, based on the totality of the factors considered, we determine that the entity sold
> in the change-in-ownership transaction can be considered a continuous business
> entity because it operated in substantially the same manner before and after the
> change in ownership.

*Remand Determination I* at 13 (footnote omitted).

> After a lengthy review and analysis of the remand record, Commerce determined that government-owned Usinor and privatized Usinor were for all intents and purposes the same person. As a result, the prior subsidies remained attributable to privatized Usinor, as all of the elements of a subsidy were established with regard to privatized Usinor. Thus, it was unnecessary for Commerce to proceed to the second step in its privatization analysis, which would have involved an inquiry into whether a subsidy had nevertheless been provided to the privatized entity through the privatization transaction itself.

*Id* at 1376 (quoting *Def.'s Br.* at 16) (emphasis added). Thus, since Commerce had previously determined that Usinor was the recipient of subsidies, it imputed the subsidies to Usinor and, therefore, GTS after the privatization.

Then Commerce used a 14-year average useful life to allocate the benefits bestowed by the nonrecurring subsidies.[4] Similarly, Commerce determined that GTS, since it had been a majority-owned subsidiary of Usinor, had also received countervailable subsidies that had not been extinguished by the privatization transaction. *Remand Determination I* at 16. Based upon its findings, Commerce recalculated GTS' CVD rate to be 6.10*% ad valorem*. *Id*. at 43.

In *GTS I,* this court found that Commerce's change in ownership methodology for determining if subsidies passed through to the newly privatized Usinor violated § 1677(5)(F). In accordance with the Federal Circuit's interpretation of 19 U.S.C. § 1677(5) in *Delverde III*, this court held that

> [t]he Federal Circuit in *Delverde* laid out certain criteria that at a minimum any new methodology must include. First, Commerce cannot rely on any *per se*

---

[4] "Commerce assumes that when a company sells 'productive assets' during 'the average useful life,' a pro rata portion of that subsidy 'passes through' to the purchaser at the time of sale. Commerce then quantifies the assumed 'pass through' amount, makes adjustments based on the purchase price, allocates an amount to the year of investigation, and calculates the *ad valorem* subsidy rate." *Delverde III,* 202 F.3d at 1363 (citing *Affirmative Countervailing Duty Determination: Certain Steel Prod. From Austria*, 58 Fed. Reg. 37,217, 37,268-69 (1993)) (citation omitted).

> rule. Second, it must look at the facts and circumstances of the TRANSACTION, to determine if the PURCHASER, received a subsidy, directly or indirectly, for which it did not PAY ADEQUATE COMPENSATION. In this instance, Commerce avoids examining the terms of the sale by arguing that under the four-part test it developed, if the pre- and post-corporation is the same person, it is not required to determine if the subsidy it found to exist pre-privatization continues post-privatization. This argument contravenes the Federal Circuit's holding in *Delverde III*.
>
> From *Delverde III*, it is evident that the court interpreted section 1677(5)(F) as *requiring* Commerce to determine if the subsidy continued to benefit the post-privatized corporation. In this instance, Commerce has developed a methodology that circumvents its statutorily mandated duty to determine if a benefit was conferred on the privatized corporation.

*GTS I*, 182 F. Supp. 2d at 1378 (emphasis in original).

In *Remand Determination II,* Commerce begrudgingly attempted to comply with this court's order. "[W]hile [Commerce does] not agree with the Court's interpretation of Delverde III, we have performed the remand, as ordered." *Remand Determination II* at 4. Commerce determined that the "overwhelming majority of the purchasers of Usinor's shares paid the full fair-market value (or more than full value) for those shares and, therefore, did not receive any countervailable subsidy." *Id.* at 4 (footnote omitted). However, Commerce also determined that "former Usinor employees who purchased the small percentage of remaining shares paid less than the full fair-market value of those shares, and thus did receive a subsidy from the French Government. . . . " *Id.* at 5. Despite Commerce's finding that a subsidy from the French Government passed through during the privatization of Usinor, it concluded "this subsidy is not countervailable because these purchasers are distinct individuals who are not, in their individual capacity, engaged in the production of the subject merchandise." *Id.* Thus, it concluded "the rate of countervailable subsidy for the subject merchandise produced and sold by GTS during the period of investigation to be 0.00 percent." *Id*. at 19.

Defendant-Intervenors argue that the remand determination is inconsistent with the statute and contrary to the record evidence.[5]

> [T]he result reached by Commerce is flatly inconsistent with the statute. Specifically, 19 U.S.C. § 1677(5)(F) (1995) provides that Commerce is *not* required to determine that a sale at arm's length by itself extinguishes a "past countervailable subsidy." A rule under which any fair market value ("FMV") sale extinguishes prior subsidies, because the new *owners* get no benefit, is the very *per se* rule – the *Saarstahl I* rule – which section 1677(5)(F) was enacted to *prevent* courts from imposing on Commerce. The legislative history expressly states that the main purpose of section 1677(5)(F) was "making clear that the *sale of a firm* at 'arm's length' *does not automatically extinguish* any previously-conferred subsidies" S. Rep. No 103-412, at 92 (1994) (emphasis added).

*Domestic Producers' Comments on the Results of Redetermination Pursuant to Court Remand* ("*Defendant-Intervenors' Remand Br.*") at 3-4 (footnote omitted, emphasis in original). Thus, Defendant-Intervenors more fully explain their previous contention that a privatization will extinguish subsides only if the purchasers "'compensate' the government /seller by, for example, paying more than FMV for the shares they receive." *Id.* at 4. Additionally, Defendant-Intervenors assert yet again that (1) Commerce's "same person" methodology that the Court rejected in *GTS I* was consistent with the Federal Circuit's decision in *Delverde III* and (2) a privatization achieved through a public stock offering cannot extinguish prior subsidies because "stock is simply a claim on earnings, a [fair market value] payment by the new owners would have precisely reimbursed the [Government of France] for the claim on earnings which it was surrendering. By definition, such a payment could not *also* have "compensated" the

---

[5] It should be noted that the court provided all parties with the opportunity to submit written briefs concerning Commerce's *Remand Determination II.* No comments were received from GTS and the Government brief supported the remand determination and requested that the court sustain the results of *Remand Determination II. See Def.'s Resp. to Domestic Producers' Comments on the Results of Redetermination Pursuant to Court Remand.*

[Government of France] for previous subsidies bestowed upon the Usinor group." *Defendant-Intervenors' Remand Br.* at 5.[6]

### III. STANDARD OF REVIEW

The court must evaluate whether the remand findings are supported by substantial evidence on the record or otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B).

### IV. DISCUSSION

In *Remand Determination II*, Commerce analyzed the privatization transaction by "gaug[ing] the reasonableness of the prices set by the [Government of France] and, consequently, whether full value was paid for the company by examining whether the sales process solicited the maximum number of potential purchasers practicable and whether the share prices set by the [Government of France] were market clearing prices." *Remand Determination II* at 11. Thus, Commerce analyzed whether the sales process was open and competitive and examined the demand levels for Usinor's shares at the prices the Government of France had offered the stock.

Commerce first analyzed the sales process the Government of France used to foster the

---

[6] In asserting this argument, Defendant-Intervenors cite a recent opinion of this Court *ACCIAI Speciali Terni S.p.A.,* et al. *v. United States*, 26 CIT __, 206 F. Supp. 2d 1344 (2002), published after *GTS I,* which upheld Commerce's "same person" methodology. There are, however, two other actions, both on remand to Commerce, rejecting Commerce's "same person" methodology. *See ACCIAI Speciali Terni S.p.A. v. United States,* 26 CIT __, 2002 WL 342659 (2002), and *ILVA Lamiere E Tubi S.R.L. v. United States*, 26 CIT __, 196 F. Supp. 2d 1347 (2002). The WTO has also weighed in on this issue in a recent panel decision. *United States - Countervailing Measures Concerning Certain Products From The European Communities*, WT/DS212/r (July 31, 2002). This decision cites *GTS I* for the proposition that Commerce cannot develop methodologies that allow it to avoid analyzing the privatization transaction. *Id.* at 7.79.

sale of Usinor's shares.

> The [Government of France's] plan for privatizing Usinor essentially divided potential purchasers of Usinor's shares into four pools: the French public, the international public, Usinor employees and stable shareholders. A certain number of shares were set aside for each group and, generally different prices were charged for each group.

*Id.* at 12. Commerce found that for the French public and international public, the sales process was open and competitive. However, "[r]egarding the shares to the employees and stable shareholders, we have determined that the sales processes included restrictions and limitations which reduced the number of investors that might have participated in the share offering" *Id.* at 15.

Commerce next focused on the pricing of Usinor's shares. Commerce determined that "[g]iven the over-subscription at FF 86 price; the fact that shares were moved from the international offering to the French offering; and the number of shares sold at each of the two prices, it appears that the market clearing price for Usinor's shares was between FF 86 and 89." *Id.* at 15. Thus, Commerce concluded that only the employees failed to pay full value for their shares because they were able to purchase shares at FF 68.80. Although it did note there were certain restrictions on these shares it did not attempt to set a market value for the employees' restricted shares. Although Commerce determined that the sale of shares to the stable shareholders was not open and competitive, Commerce concluded "[r]egarding the shares sold to stable shareholders, the stable shareholders paid a little more than full value for the shares and as such did not receive a benefit from the privatization transaction." *Id.* at 18.

Additionally, in subsequent share transactions Commerce "determined that the sales process for the shares sold by the [Government of France] in the 1997 public offering was open

and unrestricted.  Moreover, the prices paid for these shares reflected the market price for Usinor's shares.  Therefore, we determine that these investors paid full value for these shares" *Id.* at 19.

Commerce has complied with the court's instructions in *GTS I* and examined the transaction in detail.  It has determined that as a result of the analysis, the CVD rate attributable to GTS should now be 0.00%.  The court will affirm this result of remand on the record before it.  However, the court is troubled by Commerce's reasoning that although former employees of Usinor paid less than full fair-market value for the small percentage of shares they purchased "this subsidy is not countervailable because these purchasers are distinct individuals who are not, in their individual capacity, engaged in the production of the subject merchandise." *Id.* at 5.  With this rationale, Commerce became unnecessarily embroiled in the distinction between the corporation (Usinor) that received the original subsidies and the shareholders that purchased Usinor.  Commerce's better approach would have been a further analysis of the transaction to determine any benefit of this supposedly non-countervailable subsidy.  However, a remand on this issue is not warranted.  Neither Plaintiff nor Defendant-Intervenors has addressed this issue and the court declines to conclude that Commerce's approach is not in accordance with law on its own initiative in the absence of legal argument from all parties.

Furthermore, although the court agrees that "[a]n analysis that focuses on *whether* the prior subsidy has been repaid is perfectly reasonable and lawful – so long as there is no assumption that an FMV sale accomplishes repayment," the court rejects the argument that the purchasers must pay more than full fair-market value to repay subsidies.  *Defendant-Intervenors' Remand Br.* at 5 (emphasis in original).  Defendant-Intervenors fail to recognize that when

evaluated concurrent with the privatization the *value* of a subsidy given by the Government of France may differ significantly from the actual currency value of the subsidy at the time it was bestowed. For instance, if a corporation had a full fair-market value of $100 million at the time of sale and received a $50 million subsidy, Defendant-Intervenors would require that the new purchasers/owners pay $150 million to extinguish the subsidies. However, if the corporation invested the $50 million subsidy in property, plant and equipment that became outdated or unproductive, the value of the corporation could change significantly. It could be determined that the full fair market value of the corporation and the subsidies given prior to and/or during privatization, is $125 million. In addition to the reasons given in this simplistic example, there are numerous reasons why the full fair-market value of the corporation, *including the value of subsidies*, is less than the absolute dollar value of $150 million. Conversely, there could be conditions where a previous subsidy could become so valuable that new purchasers/owners would be willing to pay a premium for the corporation, which could increase the full fair-market value beyond $150 million. Thus, Defendant-Intervenors' "absolute value" approach fails to capture the true economic reality that a full fair-market valuation would consider.

### CONCLUSION

Although Commerce's *Remand Determination II* may be flawed, the parties' contentions are resolved. Plaintiff does not contest *Remand Determination II* presumably because Commerce ultimately found that the rate of countervailable subsidy was *0.00%*. Furthermore, Defendant supports Commerce's findings and requests that the court sustain its *Remand Determination II* and dismiss this action. The only parties challenging this *Remand Determination* are the Defendant-Intervenors; however, for the reasoned detailed above the court rejects their arguments. Therefore, having adjudicated and resolved the legal issues raised by the parties to this action, for the foregoing reasons, the court holds that the Department's *Final Results of Redetermination Pursuant to Court Remand, GTS Industries S.A. v. United States*, Court No. 00-03-00118 (CIT January 4, 2002) (May 10, 2002) is sustained. Judgment will be entered accordingly.

Dated: _____                          _____
     New York, NY                                      Judith M. Barzilay
                                              Judge