**Slip Op. 02-51**

## U.S. COURT OF INTERNATIONAL TRADE

## BEFORE:  GREGORY W. CARMAN, CHIEF JUDGE

|  |  |
|---|---|
| ACCIALI SPECIALI TERNI S.p.A., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant,<br><br>and<br><br>ALLEGHENY LUDLUM CORP., et al.,<br><br>Defendant-Intervenors. | Court No. 01-00051 |

[In response to Plaintiffs' motion for judgment upon the agency record under Rule 56.2, and in consideration of Defendant's and Defendant-Intervenors' memoranda in opposition thereof, Plaintiffs' motion is denied.  The Department of Commerce's determination in *Grain-Oriented Electrical Steel From Italy; Final Results of Countervailing Duty Administrative Review*, 66 Fed. Reg. 2,885 (Dep't Comm.) (January 12, 2001) is remanded.]

*Hogan & Hartson L.L.P.* (*Lewis E. Leibowitz*, *Lynn G. Kamarck*, *H. Deen Kaplan*) for Plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Lucius B. Lau*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Brent M. McBurney*, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, *Michele D. Lynch*, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant.

*Collier Shannon Scott, PLLC* (*Eric R. McClafferty*, *Michael J. Coursey*, *Kathleen W. Cannon, David A. Hartquist*) for Defendant-Intervenors.

*Dewey Ballantine L.L.P.* (*John A. Ragosta, John R. Magnus, Hui Yu*) for *Amici Curiae*.

Dated: June 4, 2002

**OPINION**

**CARMAN, CHIEF JUDGE:** Plaintiffs contest certain aspects of the United States Department of Commerce's (the Department, or Commerce) determination in *Grain-Oriented Electrical Steel From Italy; Final Results of Countervailing Duty Administrative Review*, 66 Fed. Reg. 2,885 (Jan. 12, 2001) (*Final Results*). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).

The principal dispute revolves around whether the manufacturer/exporter of the subject merchandise continued to receive countervailable subsidies after it was privatized by the Government of Italy.

**BACKGROUND**

**I. CORPORATE HISTORY OF AST**

The complex corporate history of AST begins with Instituto per la Ricostruzione Industriale (IRI), a holding company of the Government of Italy. IRI wholly owned Finsider S.p.A. (Finsider), another holding company that controlled all state-owned steel companies in Italy. Finsider's main operating subsidiary was Terni Societa' per l'Industria e l'Elettricita' S.p.A. (Terni). In 1987, as part of a restructuring, Terni transferred its assets, including those for electrical steel production, to a new company called Terni Acciai Speciali S.p.A. (TAS). *Issues*

*and Decision Memorandum: Final Results of Countervailing Duty Administrative Review: Grain-Oriented Electrical Steel from Italy* from Holly A. Kuga to Troy H. Cribb (*Decision Memorandum*) at 2, Pl. Pub. App. Ex. 2 at 2.[1]  In 1988, as part of another restructuring, Finsider and its main operating companies, including TAS, entered into liquidation and ILVA, S.p.A. (ILVA) was formed.  On January 1, 1989, the day ILVA became operational, part of TAS's liabilities and most of its assets were transferred to ILVA.  *See Final Affirmative Countervailing Duty Determination*: *Grain-Oriented Electrical Steel From Italy*, 59 Fed. Reg. 18,357, 18,358 (Apr. 18, 1994) (*Electrical Steel*).  These included all assets associated with the production of electrical steel.  On April 1, 1990, TAS's remaining assets and liabilities were transferred to ILVA.  Only certain non-operating assets remained with TAS.  *Id.*

From 1989 through 1993, ILVA consisted of several operating divisions, including the Specialty Steels Division located in Terni.  ILVA was also majority owner of many separately incorporated subsidiaries, together with which it constituted the ILVA Group.  IRI continued to own the ILVA Group.  *Id.*  In September 1993, IRI endorsed a plan to reorganize and privatize the ILVA Group by forming two new companies.  Accordingly, on December 31, 1993, the Specialty Steels Division in Terni was separately incorporated by a demerger into Acciai Speciali Terni S.r.l (AST S.r.l.) (producer of specialty steel) and ILVA Laminati Piani S.r.l. (ILP) (producer of carbon steel flat products).  The remainder of ILVA Group's assets, its existing

---

[1]The *Issues and Decision Memorandum: Final Results of Countervailing Duty Administrative Review: Grain-Oriented Electrical Steel from Italy* from Holly A. Kuga to Troy H. Cribb (*Decision Memorandum*) is included as part of *Grain-Oriented Electrical Steel From Italy; Final Results of Countervailing Duty Administrative Review*, 66 Fed. Reg. 2,885 (Jan. 12, 2001) (*Final Results*).  All page numbers for the *Decision Memorandum* are cited as paginated in Plaintiff's Public Appendix Exhibit 2.

liabilities, and much of the redundant workforce were transferred to ILVA Residua. *Decision Memorandum* at 2.

Initially, IRI owned all shares of AST S.r.l. Around the same time that IRI established AST S.r.l. as a separate corporation, IRI made a public offering for its sale. To prepare for this sale, IRI converted AST S.r.l. from a limited liability company (S.r.l.) to a stock company (S.p.A.) on February 11, 1994. *Id*.

KAI, a privately-held holding company jointly owned by German steelmaker Krupp AG Hoesch-Krupp and a consortium of private Italian companies called FAR Acciai S.r.l., agreed to purchase AST S.p.A. It signed a purchase agreement with IRI on July 14, 1994. *Id*. The European Commission approved the purchase agreement on December 21, 1994, and the shares formally changed hands effective December 23, 1994. *Id*.

Between 1995 and 1998, AST S.p.A. and its parent companies underwent several restructurings and changes in ownership. At the end of the period of review, Krupp Thyssen Stainless GmbH (part of the Krupp AG Hoesch-Krupp group) owned 90 percent of AST, and Fintad Securities S.A., a private Italian company, owned 10 percent of AST S.p.A. *Id*.

Throughout much of this opinion, the Court will refer to AST in all its forms as AST. For convenience, however, this Court will occasionally refer to AST either as Pre-Sale AST, referring to AST in its pre-privatized forms, or as Post-Sale AST, referring to AST in its privatized state.

## II.    PROCEDURAL HISTORY

On July 7, 2000, the Department published the preliminary results of its administrative review of the countervailing duty order on grain-oriented electrical steel for the period of review

January 1, 1998 through December 31, 1998, covering the manufacturer/exporter AST. *See Grain-Oriented Electrical Steel From Italy; Preliminary Results of Countervailing Duty Administrative Review and Extension of Time Limit for Final Results of Countervailing Duty Administrative Review*, 65 Fed. Reg. 41,950 (July 7, 2000) (*Preliminary Results*). In the *Preliminary Results*, the Department invited interested parties to comment upon the impact that *Delverde, SRL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000) (*Delverde III*), issued by the United States Court of Appeals for the Federal Circuit on February 2, 2000, could have upon the Department's privatization methodology. *Preliminary Results*, 65 Fed. Reg. at 41,951. The Department received comments from petitioners and AST in their case and rebuttal briefs. The Department also sent questionnaires soliciting further information from AST, the Government of Italy, and the European Commission on September 28, 2000 and October 27, 2000. *Final Results*, 66 Fed. Reg. at 2,885.

Concurrent to the above proceedings, AST challenged in this Court a separate final determination by Commerce, *Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils From Italy*, 64 Fed. Reg. 15,508 (Mar. 31, 1999) (*Stainless Steel Plate in Coils*). *See Acciai Speciali Terni S.p.A. and Acciai Speciali Terni USA v. United States and Allegheny Ludlum Corp., et al.*, No. 99-06-00364, 2002 WL 342659 (CIT Feb. 1, 2002). On August 14, 2000, the Honorable Evan J. Wallach remanded *Stainless Steel Plate in Coils* to the Department to issue a determination consistent with *Delverde III.* On November 21, 2000, the Department issued its interpretation of *Delverde III* and its revised change in ownership methodology in *Draft Results of Redetermination Pursuant to Court Remand, Acciai Speciali Terni S.p.A. v. United States* (*Draft Redetermination*).

The next day, the Department placed the public version of the *Draft Redetermination* on the record of the administrative review being challenged in this action and gave the parties an opportunity to comment upon the change in ownership approach. In addition to submitting comments on December 6, 2000, petitioners and AST participated in a public hearing held by the Department on December 15, 2000. *Final Results*, 66 Fed. Reg. at 2,885.

On December 19, 2000, the Department issued the *Final Results of Redetermination Pursuant to Court Remand*, *Acciai Speciali Terni S.p.A. v. United States* (*Final Redetermination*). *See Acciai Speciali Terni S.p.A. v. United States and Allegheny Ludlum Corp., et al.*, 2002 WL 342659 at *3. Afterwards, it placed the *Final Redetermination* on the record of the administrative review being challenged in this action.

On January 12, 2001, the Department issued the *Final Results* that Plaintiffs are challenging in this action, calculating a net subsidy rate of 14.25 percent for the period of review. 66 Fed. Reg. at 2,886.

## III. *DELVERDE III*

As stated above, the United States Court of Appeals for the Federal Circuit issued *Delverde III* on February 2, 2000. Its central role in both the Department's proceedings below and the parties' contentions before this Court necessitates a brief summary of the decision.

In *Delverde III*, Commerce conducted a countervailing duty investigation of the company Delverde for the period of review 1994. In the course of the investigation, Commerce learned that Delverde had paid fair market value (FMV) for corporate assets from a private company that had received nonrecurring countervailable subsidies from the Government of Italy from 1983- 1991. *See Delverde III*, 202 F.3d at 1362. Commerce determined the concerned assets had a 12-

year average useful life.  It divided the subsidy by the average useful life to reach an allocation of the subsidy for each of the twelve years.  Because Commerce assumed a portion of the subsidies passed through to Delverde when Delverde purchased the concerned assets, Commerce, after making adjustments based on the purchase price, allocated a subsidy amount to Delverde for its 1994 period of review.  Delverde argued before this Court that Commerce's assumption that a pro rata portion of the former owner's nonrecurring subsidies "passed through" to Delverde was erroneous and not in accordance with the Tariff Act of 1930, as amended by the Uruguay Round Agreements Act.  *Id*. at 1362-1363.  After remanding to Commerce to consider the terms of the sale to determine whether Delverde had indirectly received the former owner's subsidies, this Court affirmed Commerce's determination.  *Delverde, SrL v. United States*, 24 F. Supp. 2d 314, 317 (Ct. Int'l Trade 1998).  Delverde timely appealed to the Federal Circuit.

The Federal Circuit found that in order to conclude a person received a subsidy, 19 U.S.C. § 1677(5)(B) clearly requires Commerce to "determine that a government provided that person with both a *financial contribution* . . . and a *benefit*."  *Delverde III*, 202 F.3d at 1365 (emphasis in original).  The Court next turned to the statute's change of ownership provision, which states:

> A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

19 U.S.C. § 1677(5)(F).  The Court therefore found that although the statute prohibits the automatic conclusion that a subsidy has "been extinguished solely by an arm's length change of ownership," it also prohibits a *per se* rule that "a change in ownership *always* requires a

determination that a past countervailable subsidy continues to be countervailable." *Delverde III*, 202 F.3d. at 1366 (emphasis in original).  The Court concluded:  "[T]he statute does not contemplate any exception to the requirement that Commerce determine that a government provided both a financial contribution and benefit to a person . . . before charging it with receipt of a subsidy . . . ." *Id*.  The Federal Circuit held that Commerce's methodology was inconsistent with 19 U.S.C. § 1677(5) and therefore invalid because Commerce did not determine whether Delverde received a financial contribution and benefit.

## IV.     FINAL DETERMINATION BY THE DEPARTMENT OF COMMERCE

In its *Final Results*, Commerce stated the Federal Circuit in *Delverde III* had "rejected the same change in ownership methodology that [was] applied in the Preliminary Results  in the instant review." *Decision Memorandum* at 3.  Specifically, Commerce noted *Delverde III*'s holding that "the Tariff Act, as amended, does not allow Commerce to presume conclusively that the subsidies granted to the former owner of Delverde's corporate assets automatically 'passed through' to Delverde following the sale.  Rather, the Tariff Act requires that Commerce make such a determination by examining the particular facts and circumstances of the sale and determining whether Delverde directly or indirectly received both a financial contribution and benefit from the government." *Id.*, quoting *Delverde III*, 202 F.3d at 1364.  Accordingly, Commerce applied a new two-step change in ownership approach to determine whether AST directly or indirectly received both a financial contribution and benefit from the Government of Italy. *Decision Memorandum* at 3.  In its first step, Commerce examined whether AST "[was] the same person as the one that received the subsidies." *Id*.  To make this determination, Commerce analyzed four factors: (1) continuity of general business operations; (2) continuity of

production facilities; (3) continuity of assets and liabilities; and (4) retention of personnel. *Id.*
The Department stated it would "generally consider the post-sale entity to be the same person as
the pre-sale entity if, based on the totality of the factors considered, [it] determine[d] that the
entity sold in the change-in-ownership transaction [could] be considered a continuous business
entity because it was operated in substantially the same manner before and after the change in
ownership." *Id.* If the pre- and post-sale entities were considered to be the same person,
"nothing material [would have] changed since the original bestowal of the subsidy, so that the
statutory requirements for finding a subsidy [would be] satisfied with regard to that person."
*Final Redetermination* at 7, Pl. Pub. App. Ex. 3 at 7. This Court will refer to this step in
Commerce's analysis as the "Personhood Test."

If the pre- and post-sale entities were two distinct persons, however, Commerce would
proceed to the second step of its analysis and consider "whether any subsidy had been bestowed
upon that producer/exporter as a result of the change-in-ownership transaction." *Id.*

After analyzing the above four factors, Commerce determined that Post-Sale AST "is for
all intents and purposes the same person as that which existed prior to the privatization. Hence, .
. . [Post-Sale AST] received the financial contributions and benefits at issue in this review."
*Decision Memorandum* at 4.

Commerce applied its Personhood Test to eight subsidy programs under review: (1)
equity infusions provided by the Government of Italy, through IRI, to TAS or ILVA between
1987 and 1992 (*Decision Memorandum* at 8); (2) debt forgiveness resulting from the 1988-1990
restructuring plan (*Id.* at 8-9); (3) debt forgiveness resulting from the 1993-1994 restructuring
plan (*Id.* at 9-11); (4) government interest contributions on AST's outstanding loans financed by

IRI bond issues (*Id*. at 11); (5) pre-privatization retirement benefits to qualified steel workers under Italian Law 451/94 (*Id*. at 11-12); (6) exchange rate guarantees from the Italian Ministry of Treasury for AST's outstanding European Coal and Steel Community loans (*Id*. at 13-14); (7) European Coal and Steel Community loan to AST under Article 54 of the 1951 European Coal and Steel Community Treaty (*Id*. at 14-15); and (8) European Social Fund Objective 4 funding of training for employees in companies undergoing restructuring (*Id*. at 15-16).

## ANALYSIS

### STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in a countervailing duty administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

Commerce's factual determinations are supported by substantial evidence on the record if "such relevant evidence as a reasonable mind might accept as adequate" supports its conclusion. *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Commerce's interpretation of the countervailing duty statute is "in accordance with law" if it comports with Congress's intention on the precise question at issue. *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 881-882 (Fed. Cir. 1998). If Congress's intention is not judicially ascertainable, this Court must consider whether Commerce's interpretation of the statute is reasonable in light of the overall statutory scheme. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

**THE STATUTE**

To ascertain whether Commerce's determination is in accordance with law, this Court first examines the law as set forth in the statute. For Commerce to assess countervailing duties, Commerce must determine that a "government . . . or any public entity . . . is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States . . . ." 19 U.S.C. §1671(a)(1).

A "countervailable subsidy" is described in 19 U.S.C. § 1677(5)(B) as one in which an authority "provides a financial contribution . . . to a person and a benefit is thereby conferred." The statute defines "financial contribution" as

> (i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,
> (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,
> (iii) providing goods or services, other than general infrastructure, or
> (iv) purchasing goods.

19 U.S.C. § 1677(5)(D). The statute also details the meaning of "benefit conferred:"

> A benefit shall normally be treated as conferred where there is a benefit to the recipient, including–
> (i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,
> (ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market,
> (iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the

amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

(iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

19 U.S.C. § 1677(5)(E).

Finally, a countervailable domestic subsidy must be specific to an enterprise or industry.

*See* 19 U.S.C. § 1677(5)(A), and (5A)(D).

**ISSUES**

I.     ***Commerce's two-step methodology for determining whether Post-Sale AST continues to receive indirect or direct subsidies granted Pre-Sale AST is supported by substantial evidence on the record or otherwise in accordance with law.***

This Court finds Commerce's two-step methodology to be supported by substantial evidence on the record or otherwise in accordance with law for three reasons:  First, Commerce's methodology conforms with the statutory requirements for finding a subsidy countervailable; second, Commerce's methodology is consistent with *Delverde III*; third, Commerce's methodology is reasonable and therefore within the discretion entrusted it by Congress to determine whether the privatization of a government-owned firm has eliminated any previously conferred countervailable subsidies.

First, Commerce's two-step methodology is in keeping with the statute's clear requirement that certain elements be satisfied in order for Commerce to impose countervailing duties.  As the Federal Circuit found in *Delverde III*, "[T]he statute does not contemplate any exception to the requirement that Commerce determine that a government provided both a financial contribution and benefit to a person, either directly or indirectly . . . , before charging it with receipt of a subsidy . . . ." *Delverde III*, 202 F.3d at 1366.  Commerce complied with these

statutory requirements and found each of the subsidy programs described above to be

countervailable.

 The issue before this Court is whether Commerce properly determined that the subsidy

programs found countervailable with respect to Pre-Sale AST remained countervailable with

respect to Post-Sale AST in 1998.  The statute provides minimal guidance in this situation,

stating only that

> [a] change in ownership of all or part of a foreign enterprise or the productive assets of a
> foreign enterprise does not by itself require a determination by the administering authority
> that a past countervailable subsidy received by the enterprise no longer continues to be
> countervailable, even if the change in ownership is accomplished through an arm's length
> transaction.

19 U.S.C. § 1677(5)(F).  The statute does not require that Commerce make a second financial

contribution and benefit determination if the entity that originally received the subsidy is the

same one being reviewed after privatization.  Such a determination would only be redundant.

Therefore, Commerce's two-step methodology is in accordance with the statute.

 Second, Commerce's two-step methodology is consistent with *Delverde III*.  In *Delverde*

*III*, the Federal Circuit held that the statute prohibits a *per se* rule for determining whether a

subsidy continues to be countervailable to a new owner following a change in ownership.

*Delverde III*, 202 F.3d at 1366, 1368.  Instead, the Court stated that the Tariff Act of 1930

requires Commerce to examine the particular facts and circumstances of the sale in order to

determine whether the subsidies granted to the former owner of an entity's corporate assets pass

through to the new owner following the sale.  *Delverde III*, 202 F.3d at 1364.  *Delverde III*

stresses the need to determine whether subsidies continue to be countervailable to the *new owner*.

 In response to *Delverde III*, Commerce first determined whether Post-Sale AST was the

same person as Pre-Sale AST, the original subsidy recipient. Finding them to be the same, Commerce considered the statutory requirements for finding a subsidy to have been met and therefore continued to impose countervailing duties against AST. Commerce's analysis does not result in an automatic assessment of countervailing duties against a new owner of the shares of AST. In this case, Commerce is assessing duties against AST, not against KAI or any of the subsequent owners of AST's stock. A subsidy recipient is usually distinguishable from an owner of shares of the subsidy recipient's stock.[2]

A sale of 100 percent of a corporation's shares demonstrates this distinction. Commerce has stated that "a simple sale of shares . . . is the type of case that would most readily reveal no change in the legal person." *Final Redetermination* at 9-10, Pl. Pub. App. Ex. 3, at 9-10. This is because a stock purchase changes the identity of the shareholders who own the original subsidy recipient, but it does not affect the identity of the corporate entity itself. Therefore, absent evidence that the subsidy has been extinguished, the subsidy merely continues to reside in the corporation that is now owned by new shareholders. *See e.g., British Steel v. United States*, 879 F. Supp. 1254, 1273 (Ct. Int'l Trade 1995), *aff'd in part, rev'd in part on other grounds by LTV Steel, Inc. v. United States*, 174 F.3d 1359 (Fed. Cir. 1999) (discussing hypothetical in which a subsidy does not travel after a change in shareholders of a corporation but remains with the

---

[2]The Court distinguishes its analysis from the analyses found in *Allegheny Ludlum Corp. v. United States*, 182 F. Supp. 2d 1357 (Ct. Int'l Trade 2002), *GTS Industries S.A. v. United States,* 182 F. Supp. 2d 1369 (Ct. Int'l Trade 2002), *Acciai Speciali Terni S.p.A. and Acciai Speciali Terni USA v. United States and Allegheny Ludlum Corp., et al.*, No. 99-06-00364, 2002 WL 342659 (Ct. Int'l Trade Feb. 1, 2002), and ILVA *Lamiere E Tubi S.R.L., et. al.*, No. 00-03-00127, 2002 WL 484675 (Ct. Int'l Trade Mar. 29, 2002). In those cases, a key consideration was whether the new owner received the benefit of the financial contribution. In this case, the Court focuses upon whether the original subsidy recipient, being the same person before and after the change of ownership, continues to receive the subsidy benefit.

corporation that continues to exist).

A sale of only several corporate assets presents a different scenario.  There it could be argued that the new owner has stepped into the shoes of the subsidy recipient, requiring a new determination of financial contribution and benefit.  However, Commerce's four-factor analysis allows it to identify substance over form of the transaction.  If the commercial reality is a shared identity between pre- and post-privatization entity, Commerce may presume the subsidy remains with the post-privatization entity absent evidence to the contrary.

Plaintiffs have the responsibility to demonstrate that the benefits from prior subsidies have been extinguished, either through the change of ownership or otherwise.  The change of ownership provision at 19 U.S.C. § 1677(5)(F) does not require Commerce to conduct a second benefit determination.  Rather, it addresses the sufficiency of the subsidy recipient's evidence that a subsidy is no longer countervailable.  It states that "[a] change in ownership . . . does not *by itself* require a determination by the administering authority that a past countervailable subsidy . . . no longer continues to be countervailable, *even if* the change in ownership is accomplished through an arm's length transaction."  19 U.S.C. § 1677(5)(F) (emphasis added).  Commerce is not required to conduct a second benefit investigation once it determines that the original subsidy recipient remains the same following a change of ownership.

Plaintiffs point to no record evidence that the benefits from the subsidy programs have been extinguished.  Plaintiffs argue that *Delverde III* requires Commerce to make a benefit determination whenever there has been a fundamental change in ownership and that the benefit determination must turn upon whether Fair Market Value (FMV) was paid for the company.  Plaintiffs contend that such a determination would reveal that neither AST nor its current owner

received benefits because the buyers paid FMV arrived at through arm's length negotiations after

an open and competitive bidding process. They assert that the bidding process resulted in a

higher purchase price than the seller's independent consultants had originally projected.

Nowhere in Plaintiffs' briefs do they point to evidence on the record that the FMV, although

higher than originally projected, was in any way affected by AST's countervailing duty liability.

The mere payment of more or less for the purchase of shares of stock would seem to have no

impact by itself upon the amount of countervailable duty liability any more than such payment

would have on the amount of a mortgage liability that was the responsibility of AST. It would

simply mean the purchaser of stock paid more or less for its shares. Such payment by itself

would not extinguish liabilities to third parties.

Finally, Commerce's two-step methodology is reasonable and therefore within the

discretion entrusted it by Congress to determine whether the privatization of a government-

owned firm has eliminated any previously conferred countervailable subsidies. The statute, its

legislative history, and *Delverde III* do not indicate the method by which Commerce is to make

this determination. However, the Statement of Administrative Action states:

> The issue of the privatization of a state-owned firm can be extremely complex and
> multifaceted. While it is the Administration's intent that Commerce retain the
> discretion to determine whether, and to what extent, the privatization of a
> government-owned firm eliminates any previously conferred countervailable
> subsidies, Commerce must exercise this discretion carefully through its
> consideration of the facts of each case and its determination of the appropriate
> methodology to be applied.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. REP. NO. 103-826, at

928 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4241. The Court in *Delverde III* also noted

that the statute's change of ownership provision "does not direct Commerce to use any particular

methodology for determining the existence of a subsidy in a change of ownership situation."

Therefore, this Court accords deference to Commerce's decision to make as its first step a determination of whether the pre- and post-privatization entities share the same identity.

In this case, Commerce acted within its discretion when it looked to principles of corporate successorship for guidance. It is reasonable to consider criteria developed in the corporate context for determining whether a company that has undergone a change in ownership carries on substantially the same business after the change in ownership and therefore remains responsible for previously incurred liabilities. *Final Redetermination* at 9-11, Pl. Pub. App. Ex. 3, at 9-11.

**II.** *Commerce's decision to compare Pre-Sale AST to KAI-owned Post-Sale AST for purposes of its Personhood Test is supported by substantial evidence or otherwise in accordance with law.*

Plaintiffs argue that in applying the Personhood Test, Commerce should have compared Post-Sale AST to ILVA as a whole rather than to Pre-Sale AST. This Court finds Commerce properly chose to compare Pre- and Post-Sale AST because "[a]ll of the subsidies that were bestowed on the predecessor operations of AST continued to benefit the business that was separately incorporated as AST as part of the 1993 ILVA demerger." *Final Redetermination* at 17, Pl. Pub. App. Ex. 3, at 17. Pre-Sale AST existed as a separate corporate entity prior to its 1994 privatization, and a reasonable mind could accept this as relevant evidence that Pre-Sale AST is the appropriate entity with which to compare Post-Sale AST.

Although Commerce described the demerger as a non-event in the *Decision Memorandum*, it did so to emphasize there had been no ultimate change in ownership of AST after the demerger. The Government of Italy, through its holding company IRI, continued to own

AST before the demerger and until AST's privatization. *Id*.

### III. *Commerce's determination that Pre- and Post-Sale AST are the same entity is not supported by substantial evidence on the record or otherwise in accordance with law.*

Commerce cites evidence on the record, developed through the application of the four factors, to support its conclusion that Pre- and Post-Sale AST are the same entity:

(1)  Continuity of General Business Operations:  Commerce found record evidence to indicate that AST production base and products remained the same after privatization.  In addition, IRI expected to obtain a higher sale price by selling AST as an operating entity rather than auctioning its individual assets. *Decision Memorandum* at 3, citing AST October 20, 2000 Questionnaire Response at 6.  Finally, AST held itself out as a continuation of the previous enterprise by operating under the same name, AST, and by maintaining its access to the markets and customers that KAI had found desirable before purchasing AST. *Decision Memorandum* at 3-4, citing AST October 20, 2000 Questionnaire Response at 41.

(2)  Continuity of Production Facilities:  AST's principal specialty steel production facilities remained located in Terni. *Decision Memorandum* at 4.

(3)  Continuity of Assets and Liabilities:  Commerce found that all of AST's corporate assets were taken over by KAI and that Pre-Sale AST's liabilities were transferred through the privatization intact. *Id*. citing Government of Italy November 14, 2000 Questionnaire Response at 3.

(4)  Retention of Personnel:  Commerce found that KAI intended to maintain the AST workforce in place after privatization.  The IMI Report, commissioned by the Government of Italy to value AST, highlighted continuity in AST's personnel. *Decision Memorandum* at 4, citing AST October 20, 2000 Questionnaire Response at 15.  Ultimately, Commerce found nothing in the record indicating a substantial change in AST's workforce as a result of the privatization. *Final Redetermination* at 22, Pl. Pub. App. Ex. 3, at 22.

Commerce determined, based upon the totality of the factors considered, that Post-Sale AST was operated in substantially the same manner after the change in ownership as it was prior to its sale.  The Court finds that substantial evidence on the record supports Commerce's determinations that there were continuity of general business operations and production facilities

and retention of personnel between Pre- and Post-Sale AST. The Court notes, however, that Commerce's analysis of the third factor could lead to the conclusion that *no* continuity of assets and liabilities remained between Pre- and Post-Sale AST; rather, KAI, in a possible capacity as a separate purchaser, could have become legally responsible for all of AST's assets and liabilities. Defense counsel at oral argument appeared to disavow such a conclusion. Because Commerce's wording is unclear, the Court remands to Commerce to clarify whether KAI, in a capacity as a separate purchaser, became legally responsible for all of AST's assets and liabilities or explain if Post-Sale AST continued to have responsibility for all of Pre-Sale AST's assets and liabilities. If Commerce determines that KAI became legally responsible for all of AST's assets and liabilities, this Court orders Commerce to discuss whether substantial evidence supports its conclusion that Pre- and Post-Sale AST are the same entity.

**IV.** ***Commerce's two-step methodology for determining whether Post-Sale AST continues to receive indirect or direct subsidies granted Pre-Sale AST is not inconsistent with the World Trade Organization Appellate Body's ruling in*** <u>***UK Leaded Bar***</u>***.***

Plaintiffs claim this Court should construe the countervailing duty statute in accordance with *United States–Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom*, WT/DS138/AB/R, Report of the Appellate Body (May 10, 2000) (*UK Leaded Bar*). In *UK Leaded Bar*, the World Trade Organization Appellate Body upheld the Dispute Settlement Panel's finding that, under the specific circumstances of the case, financial contributions bestowed upon a state-owned company between 1977 and 1986 could not be deemed to confer a benefit upon subsequent corporations that paid FMV to the state-owned company for its "productive assets, goodwill, etc." *UK Leaded Bar* at Paragraph 68. The WTO Appellate Body, however, specifically limited its finding to the

particular circumstances of *UK Leaded Bar.  UK Leaded Bar* at Paragraphs 74, 75(b) and (c).

This Court does not therefore find it necessary to consider whether it must construe U.S.

countervailing duty law in accordance with *UK Leaded Bar*.  This case is limited by its facts,

although this Court finds the methodology employed by Commerce to be supported by

substantial evidence on the record or otherwise in accordance with law.  The Court's holding in

this case is not at variance with *UK Leaded Bar*.  The cases are clearly distinguishable.  In both

instances the tribunals have examined unique facts presented and have based their decisions upon

those unique facts.  Commerce will be obliged in the future to examine facts presented on a case-

by-case basis as it applies its methodology to its determinations.

**V.      *Commerce properly applied the use of facts otherwise available and adverse inferences regarding pre-privatization asset spin-offs from ILVA and post-privatization sales of shares.***

Plaintiffs argue that even if Commerce lawfully applied its Personhood Test, it unlawfully

imposed an incorrect subsidy by failing to attribute a portion of the subsidies to pre-privatization

spin-offs from ILVA and post-privatization sales of shares.  Defendant asserts Commerce

properly resorted to use of facts otherwise available and adverse inferences in determining that

the pre-privatization asset spin-offs and post-privatization sales of shares had no effect upon

AST's subsidy benefits.

Commerce may make a determination on the basis of facts available if an interested party

"withholds information that has been requested by the administering authority" or "significantly

impedes" a countervailing duty review.  19 U.S.C. § 1677e(a)(2)(A), (C).  In addition,

Commerce may resort to adverse inferences if "an interested party has failed to cooperate by not

acting to the best of its ability to comply with a request for information from the administering

authority." 19 U.S.C. § 1677e(b). Because AST failed to provide requested information regarding pre-privatization spin-offs and post-privatization sales of shares, Commerce found the information on the record to be too incomplete to serve as a reliable basis for determining whether the entities sold in the transactions were the same entities that benefitted from subsidies prior to their sale. *See Decision Memorandum* at 7.

In Commerce's October 16, 2000 remand supplemental questionnaire to the Government of Italy, Commerce stated: "The purpose of this remand is to re-examine our change-in-ownership methodology in light of, *inter alia*, *Delverde*. We therefore reiterate our request for complete remand questionnaire responses with regard to all of the changes in ownership. If we determine that this information is necessary to our remand determination and it is [sic] not been provided, we may resort to facts otherwise available, including assumptions that are adverse to the respondent's interests." *Final Redetermination* at 36, citing Government of Italy October 16, 2000 Remand Supplemental Questionnaire at 3.

AST and the Government of Italy failed to provide the requested information. Instead, AST argued it was irrelevant to Commerce's treatment of AST's privatization and, together with the Government of Italy and the European Commission, "respectfully request[ed] that the Department explain how such information [was] pertinent to the proper scope" of the determination. *Decision Memorandum* at 7, quoting AST October 19, 2000 Supplemental Questionnaire Response at 29. In Commerce's October 27, 2000 supplemental questionnaire, Commerce noted the parties' deficient responses and reiterated its request, but AST and the Government of Italy failed to correct the deficiencies. *Decision Memorandum* at 7. Based upon the parties' affirmative refusals to provide the requested information, Commerce determined that

AST and the Government of Italy had failed to cooperate. This Court finds, therefore, that Commerce properly resorted to the use of facts otherwise available and adverse inferences. Because the information on the record was too incomplete to serve as a reliable basis for determining whether the entities sold in the transactions were the same entities that benefitted from subsidies prior to the sale, Commerce properly applied the adverse inference that, once sold, the pre-1993 asset spin-offs did not constitute the same entity as ILVA and that the subsidy benefits therefore remained within ILVA's divisions. Commerce also properly applied the adverse inference that the post-privatization sales of shares did not affect the subsidy benefits to AST.

**VI.** ***Commerce's decision not to attribute a portion of the privatization purchase price to the repayment of prior subsidies is supported by substantial evidence on the record or otherwise in accordance with law.***

Plaintiffs contend Commerce should have applied its pre-*Delverde III* approach of attributing a portion of the privatization purchase price to the repayment of prior subsidies. This argument was rejected by *Delverde III*. *See Delverde III*, 202 F.3d at 1367. Therefore, this Court finds Commerce's decision not to apply its pre-*Delverde III* approach of attributing a portion of the privatization purchase price to the repayment of prior subsidies to be supported by substantial evidence or otherwise in accordance with law.

**VII.** ***Commerce's treatment of the 1993 spinoff of AST is supported by substantial evidence on the record or otherwise in accordance with law.***

Commerce found that as of December 31, 1993, ILVA Residua was "essentially a shell company with liabilities far exceeding assets." *Decision Memorandum* at 9. The majority of ILVA's debt had been placed in ILVA Residua rather than proportionately allocated to the spun-off entities AST and ILP. *Id.* at 10. In such a situation, it is Commerce's "practice to allocate

otherwise untied liabilities remaining in a shell corporation to the new, viable operations that had been removed from the predecessor company." *Decision Memorandum* at 30.  Commerce's determination that AST received a benefit through debt forgiveness at the time of the spinoff is therefore supported by substantial evidence.

In valuing the benefit that AST received, Commerce analyzed the creditworthiness of ILVA as a whole.  *See Decision Memorandum* at 33.  Commerce found that ILVA, of which AST was a part, benefitted from the Government of Italy's ultimate assumption of the losses of the units originally comprising ILVA.  *Id*.  AST's debt forgiveness occurred at the moment of its incorporation; Commerce reasoned that it would be illogical to base its creditworthiness on AST's future prospects after the debt forgiveness had been granted because the debt forgiveness itself would have an impact upon private, commercial lenders' decisions of whether to lend funds to AST.  *Id*., citing *Stainless Steel Plate in Coils*, 64 Fed. Reg. at 15,524.  Therefore substantial evidence supports Commerce's decision to focus upon ILVA's creditworthiness and not to focus upon AST's creditworthiness.

Plaintiffs argue the figure arrived at for the amount of debt forgiven did not account for cash received in sales of viable assets.  However, the countervailing duty statute requires Commerce to calculate subsidies upon the basis of the benefit to the recipient rather than upon the cost to the government.  *See* 19 U.S.C. § 1677(5)(E).  At the time of the spinoff, AST benefitted to the extent it did not assume a proportional share of ILVA's liabilities.  *Decision Memorandum* at 31.  Therefore, Commerce properly considered the benefit to AST rather than the ultimate cost to the Government of Italy in conducting its countervailing duty calculations. This Court finds Commerce's calculation of the amount of debt forgiven by the Government of

Italy to be supported by substantial evidence on the record or otherwise in accordance with law.

**VIII.** ***Commerce's determinations regarding program-specific issues are supported by substantial evidence on the record or otherwise in accordance with law.***

In addition to disputing Commerce's privatization analysis, Plaintiffs contend Commerce erred in determining that certain subsidies were countervailable. This Court finds that Commerce's determinations regarding these program-specific issues, set forth below in subsections A - D, are supported by substantial evidence on the record or otherwise in accordance with law.

   A. ***Commerce's finding that the European Social Fund Objective 4 funding is a countervailable subsidy is supported by substantial evidence on the record and otherwise in accordance with law.[3]***

The European Social Fund, operated by the European Commission, provided assistance to AST during the period of review through Objective 4, which funds training for employees in companies undergoing restructuring. Commerce determined that the training programs provided a countervailable benefit to AST because the programs relieved it of a training obligation it would otherwise have incurred. Commerce stated that no new information or evidence of changed circumstances had been submitted to reconsideration of its previous finding that this program is countervailable. *Decision Memorandum* at 15.

Plaintiffs contend there is no basis for Commerce's determination that the European Social Fund Objective 4 funding is specific and therefore countervailable. However, Commerce found that despite its requests for information on the use of Objective 4 funds by the European

---

[3]The Court notes that the parties have characterized the European Social Fund Objective 4 funding program as a post-privatization program. *See* Letter from Hogan & Hartson L.L.P. (on behalf of all parties) to United States Court of International Trade (May 23, 2001), at 3.

Community and the Government of Italy, the Government of Italy, the European Union, and AST

provided no new information or evidence of changed circumstances in this review to warrant

reconsideration of Commerce's finding in this case. *Decision Memorandum* at 34. They did not

demonstrate any efforts to obtain the information or offer any alternatives. *Id*. Therefore,

Commerce's use of an adverse inference to find *de facto* specificity with respect to this program

is supported by substantial evidence on the record or otherwise in accordance with law.

> **B.** ***Commerce's determination that the European Coal and Steel Community is an authority that has provided a financial contribution pursuant to 19 U.S.C. § 1677(5)(B) is supported by substantial evidence on the record or otherwise in accordance with law.***[4]

Under Article 54 of the 1951 European Coal and Steel Community Treaty, eligible

companies can receive loans for up to 50 percent of the cost of an industrial investment project.

The companies apply directly to the European Commission, which administers the European

Coal and Steel Community. Once loan approval has been granted, the European Coal and Steel

Community borrows funds at commercial rates which it then lends to steel companies at a

slightly higher rate to cover administrative costs. Commerce has previously found Article 54

loans to be specific countervailable subsidies, and it stated that no new information or evidence

of changed circumstances had been submitted in this proceeding to warrant reconsideration of its

finding. *Decision Memorandum* at 14.

During the period of review, AST had one such outstanding loan, contracted in 1978. In

1987, the interest rate on this loan was reduced even though ILVA was not creditworthy.

---

[4]The Court notes that the parties have characterized the European Coal and Steel Community Article 54 loan program as a post-privatization program. *See* Letter from Hogan & Hartson L.L.P. (on behalf of all parties) to United States Court of International Trade (May 23, 2001), at 3.

Therefore, Commerce treated the loan as if it were contracted in 1987 and calculated the benefit AST received by comparing the interest amount it should have paid at the benchmark interest rate for uncreditworthy companies to the amount AST actually paid during the period of review. *Id.* at 15.

Plaintiffs argue that because the European Coal and Steel Community does not convey government funds to borrowers, the loans do not constitute a financial contribution provided by a public entity as required by 19 U.S.C. § 1677(5)(B). In response, Commerce has stated that "we see no requirement in the [Subsidies and Countervailing Measures] Agreement nor the Act that the financial contribution must be funded in a particular manner." *Id.* at 35. Plaintiffs have not directed this Court's attention to any statutory requirement that a financial contribution involve the expenditure of public funds.

Commerce has stated that the European Coal and Steel Community "is part of the European Union, which undeniably is a particular form of governmental body." *Stainless Steel Plate in Coils*, 64 Fed. Reg. at 15,529. Commerce, citing 19 U.S.C. § 1677(5)(D)(i), has also stated that "a financial contribution includes the direct transfer of funds, such as the provision of loans." *Decision Memorandum* at 35. This Court therefore finds Commerce's determination that the European Coal and Steel Community is an authority that has provided a financial contribution pursuant to 19 U.S.C. § 1677(5)(B) is supported by substantial evidence on the record or otherwise in accordance with law.

      **C.**      *Commerce's determination that Law 451/94 retirement benefits to retirees are countervailable is supported by substantial evidence on the record or otherwise in accordance with law.*[5]

When AST and ILP were spun off in preparation for their privatization, much of ILVA's redundant workforce was placed in ILVA Residua. *Decision Memorandum* at 2. Under Law 451/94, qualified steel workers applying for benefits in 1994, 1995, and 1996 could receive early retirement packages.

Commerce had previously found this program to be specific and stated that at the time of negotiating the terms of the lay-offs, ILVA, the labor ministry, and the unions knew the government would ultimately make contributions to worker benefits. *See Decision Memorandum* at 12. In keeping with past practice, therefore, Commerce treated half of the amount paid by the government as a financial contribution benefitting ILVA. *Id.* Plaintiffs claim Law 451/94 retirement benefits to retirees are not countervailable because AST had no *de jure* or *de facto* obligation to retain the workers who chose to retire early. In its *Decision Memorandum*, Commerce cites to its past finding of countervailability of Law 451/94 retirement benefits. *See Decision Memorandum* at 12, citing *Stainless Steel Plate in Coils*, 64 Fed. Reg. at 15,514. There, Commerce recognized that the entities spun-off from ILVA would be required to enter into negotiations with the unions before laying off workers. *See Stainless Steel Plate in Coils*, 64 Fed. Reg. at 15,514-15. It also pointed to statements by Government of Italy officials at verification indicating labor unrest, strikes, and lawsuits would result from failure to negotiate a separation package. *Id.* Plaintiffs provided no new information or evidence of changed

---

[5]The Court notes that the parties have characterized the Law 451/94 retirement benefits program as a post-privatization program. *See* Letter from Hogan & Hartson L.L.P. (on behalf of all parties) to United States Court of International Trade (May 23, 2001), at 3.

circumstances to Commerce to warrant a reconsideration of its finding that AST was relieved of having to assume a respective portion of the redundant workers placed in ILVA. *Decision Memorandum* at 12. Therefore, Commerce's determination that Law 451/94 retirement benefits to retirees are countervailable is supported by substantial evidence on the record or otherwise in accordance with law.

> **D.** ***Commerce's determination that the 1988 Finsider payment to ILVA is countervailable is supported by substantial evidence on the record or otherwise in accordance with law.***

Plaintiffs argue that Finsider's payment to ILVA in September of 1988 was not countervailable because it was not tied to subject merchandise. Commerce, however, considers equity infusions as untied subsidies benefitting the recipient company's total consolidated sales. *See Countervailing Duties, Final Rule,* 63 Fed. Reg. 65,348, 65,400 (Nov. 25, 1998). Plaintiffs have not demonstrated that the benefits of the equity infusion were tied to non-steel activities. *See Decision Memorandum* at 37, citing *Stainless Steel Plate in Coils,* 64 Fed. Reg. at 15,527. This Court therefore finds Commerce's determination that the 1988 Finsider payment to ILVA is countervailable is supported by substantial evidence on the record or otherwise in accordance with law.

CONCLUSION

Upon consideration of Plaintiffs' motion for judgment upon the agency record under Rule 56.2, Defendant's and Defendant-Intervenors' memoranda in opposition thereto, and other pertinent papers, Plaintiffs' motion is denied.  The Department of Commerce's determination in *Final Results* is remanded to Commerce to explain whether it has determined that KAI, in a capacity as a separate purchaser, became legally responsible for all of AST's assets and liabilities or explain if Post-Sale AST continued to have responsibility for all of Pre-Sale AST's assets and liabilities.

If Commerce has determined that KAI became legally responsible for all of AST's assets and liabilities, Commerce is directed to explain whether substantial evidence on the record supports its conclusion that continuity of assets and liabilities remained between Pre- and Post-Sale AST.  If Commerce determines that substantial evidence does not support the conclusion that continuity of assets and liabilities remained between Pre- and Post-Sale AST, Commerce is directed to explain whether substantial evidence on the record supports its determination that Pre- and Post-Sale AST are the same entity.

If Commerce determines that substantial evidence on the record does not support its determination that Pre- and Post-Sale AST are the same entity, Commerce is directed to explain whether Post-Sale AST received benefits from the countervailable subsidies made to Pre-Sale AST.  If Commerce determines that Post-Sale AST did not receive benefits from the countervailable subsidies made to Pre-Sale AST, Commerce is directed to explain which of the eight subsidy programs listed in this opinion are not countervailable against Post-Sale AST and why they are not countervailable against Post-Sale AST.

Commerce is directed to file its redetermination with the Clerk of this Court no later than the close of business on Monday, June 24, 2002; any responses by Plaintiffs must be filed with the Clerk of this Court no later than the close of business on Monday, July 1, 2002; any rebuttal comments by Defendant and Defendant-Intervenors must be filed with the Clerk of this Court no later than the close of business on Monday, July 8, 2002.

_____
Gregory W. Carman
Chief Judge

Dated: June 4, 2002
      New York, New York

## ERRATUM

*Acciali Speciali Terni S.p.A., et al. v. United States and Allegheny Ludlum Corp., et al.*, Court No. 01-00051, Slip Op. 02-51, dated June 4, 2002.

    Replace the first word of the case title, "Acciali", with the word "Acciai".